IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

```
MARÍA MAGDALENA MARTINEZ      )
GONZÁLEZ,                     )
                             )
     Petitioner,             )
                             )        CIVIL ACTION NO.
     v.                      )        3:15cv282-MHT
                             )            (WO)
THOMAS DAVID PRESTON,         )
                             )
     Respondent.             )
```

OPINION

This is a case about a father's alleged abduction

of his children from their mother and home in Mexico to

his home in Alabama. Petitioner María Magdalena

Martinez González asserts in a petition to this court

that her estranged husband, respondent Thomas David

Preston, wrongfully removed their children from Mexico

to the United States in violation of the Hague

Convention on the Civil Aspects of International Child

Abduction as well as the federal legislation

implementing the Convention, the International Child

Abduction Remedies Act, 22 U.S.C. §§ 9001-9011

(formerly 42 U.S.C. §§ 11601-11610).  This court has original jurisdiction over her petition pursuant to 22 U.S.C. § 9003(a) and 28 U.S.C. § 1331.

The court previously issued a temporary restraining order and preliminary injunction prohibiting Preston and anyone cooperating with him from removing the children from Alabama while the court decides the case.

Martinez's petition is now before the court for a final decision on the merits.  She seeks the return of her children to her home in Ciudad Juárez so that a Mexican court can determine custody under Mexican law. Based on the evidence presented at a hearing, in which Martinez (by live video), Preston, and others testified, the court finds in favor of Martinez.


## I.  BACKGROUND

Petitioner Martinez is married to respondent Preston.  They have two children together, a four-year-old son and a two-year-old daughter.  Both

2

children were born in Ciudad Juárez, in the state of Chihuahua, Mexico.  Martinez is a Mexican citizen, and Preston is an American citizen.

Preston and Martinez were married in 2010, and their first child together, a son, was born in early 2011.  They separated a few months later, and Preston took their son with him to Alabama.  Preston contends that he left with Martinez's goodwill, but Martinez maintains that she never gave him permission to take away their son.  Shortly after they left, Martinez filed a criminal complaint against Preston for abducting their son, but Preston refused to return to Mexico or to allow Martinez to see their son for six months.  He finally returned to Juárez with their son when he learned that Martinez was pregnant with their daughter.  After their daughter was born in 2012, the family lived together in Juárez again, though Preston frequently traveled away from home for his job as a truck driver.

When they lived together in Juárez, they shared custody of the children. Martinez sometimes worked at restaurants, bars, and factories, though she was not always employed outside the home; Preston worked for several trucking companies. As a result, the children were sometimes in the care of a local daycare or were at home under the supervision of one of Martinez's older children.

At the hearing, Preston testified that, while he was living in Mexico, he inquired with local authorities about initiating judicial proceedings to gain sole custody of the children. However, he contends that he was told that, because he did not have resident status in Mexico, he was not able to initiate family-court proceedings. Additionally, he testified that he was dissuaded from complaining to Mexican officials for fear of the children being taken into Mexican custody. So, Preston testified, he took matters into his own hands.

In mid-April 2014, Preston convinced Martinez to sign two purported legal documents that he drafted on his home computer, both written in English. The parties dispute the extent of Martinez's English-language skills and whether she understood these documents.

The two documents Preston presented to Martinez were titled "Termination of Parental Rights Form" and "Travel Consent Form." Martinez testified that Preston told her that the documents were necessary for the family to immigrate to the United States.[1] According to Preston, the purpose of the documents was to memorialize Martinez's consent--which he contends that she had given him verbally--to her forfeiture of all

---

1. Both parties testified that on several occasions the family had discussed moving to the United States, and Preston testified that he initiated United States visa applications for the non-citizen family members. Preston explained that he applied for visas for both Martinez and her other, older children; Martinez testified that he applied for visas for only her other children and not for herself.

5

her custody rights over the children and to his taking the children to the United States.   Though he has a firm grasp of the Spanish language, Preston testified that he drafted the documents in English so that they would be recognized and understood in the United States.

The "Travel Consent Form" stated that Martinez allowed her two children "to travel and relocate with their father" to the United States "for a indefinite period of time."   Travel Consent Form (doc. no. 4-3), at 2.   The "Termination of Parental Rights Form" stated that Martinez "wish[ed] to terminate all parental rights" to her children because she was "unfit and unable to care for them, due to [her] alcoholism and continued drug use."   Termination of Parental Rights Form (doc. no. 4-2), at 2.   The form also states that Martinez agreed not to have any contact with the children until they turned 18 and that Preston would

have sole custody. Id. Each forms bears both Martinez's and Preston's signatures.

Martinez testified that she signed both of these documents at their home in Juárez and that no notary was present. Preston testified that these documents were signed in the presence of a notary on an 'international bridge' dividing Ciudad Juárez, Mexico and El Paso, Texas. The "Travel Consent Form," though not the "Notice of Termination of Parental Rights Form," bears the notary stamp of a Texas-based notary. Preston contends the notary refused to notarize the "Termination" form because it was a legal document that needed to be authorized by a court.

On April 29, 2014, two weeks after signing these documents, Martinez came home from work to discover that Preston had left with the two children and their belongings. Martinez immediately called Preston's cell phone to find them, but he did not answer. She continued to call, and she also reached out to

Preston's mother.  The next day, she learned by phone that Preston had taken the children to his mother's home in Lanett, Alabama.  Martinez contends that Preston and his mother refused to allow Martinez to speak with the children.

Three days later, Martinez filed a criminal charge in Mexico against Preston for abduction of the children.  Shortly thereafter, Martinez went to the Mexican Ministry of Foreign Affairs to report the abduction, and she began to assemble her Hague Convention petition.  She submitted her statement to the Mexican Ministry on May 12, 2014; after its own internal investigation, the Mexican government forwarded her case to the United States Department of State, which helped Martinez find local Alabama counsel to initiate these proceedings.

A few weeks after he left with the children, Martinez spotted Preston back in Ciudad Juárez and alerted police.  He was arrested, but he produced the

purported travel and parental-termination documents for police, and he was released on bail. The authorities later showed Martinez the documents, which is when she learned what they really meant. In early June 2014, Martinez successfully petitioned for provisional custody of the children under Mexican law in the Bravos District family court of Chihuahua; Preston did not respond to these proceedings.

When Preston and the children arrived in Alabama, they moved in with Preston's mother in Lanett. After a few months, Preston rented a separate home on the same block as his mother's, and the children now reside there with Preston, unless he is traveling for work, in which case they stay with Preston's mother or a babysitter.


## II. DISCUSSION

The Hague Convention on the Civil Aspects of International Child Abduction is an international

treaty established to "secure the prompt return of children wrongfully removed to or retained in any Contracting State" and to ensure that, when child-custody disputes arise between parents or guardians across international borders, custody rights are respected between signatory countries. <u>See</u> Hague Convention on the Civil Aspects of International Child Abduction, arts. 1(a), 2, October 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89. Both the United States and Mexico are "Contracting States" to the treaty.

By facilitating the child's return to the parent left behind, the Convention restores the factual <u>status quo</u> before the child was wrongfully removed, so that any legal custody disputes will take place in the country of the child's habitual residence. <u>See</u> <u>Baran v. Beaty</u>, 526 F.3d 1340, 1344 (11th Cir. 2008) ("When a child has been wrongfully removed from his country of habitual residence, the Convention provides the non-abducting parent with a remedy of return, intended

10

to restore the parties to the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic forum for child custody proceedings.").

In other words, Convention provisions do not regulate the substantive legal relationships between parents or families. Nor does the treaty allow a court to settle any custody dispute on the merits, unless it is determined that a child is not to be returned. Hague Convention, art. 16. Formal custody is to be determined later, by a court in the child's country of habitual residence. See Abbott v. Abbott, 560 U.S. 1, 20 (2010) ("The Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence.").

The Convention also creates certain defenses that, if established by the respondent, may justify denying relief to the petitioner. For example, if the

11

respondent proves that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," the court may refuse to return the child.  Hague Convention, art. 13(b); see also 22 U.S.C. § 9003(e)(2)(A).  The court also may refuse to return the child if a year or more has passed since the wrongful removal and the respondent proves that the child "is now settled in its new environment."  See Hague Convention, art. 12; see also 22 U.S.C. § 9003(e)(2)(B).

The International Child Abduction Remedies Act, the implementing statute for the Convention, sets forth legal rights and procedures for aggrieved parents and guardians seeking relief in United States courts.  22 U.S.C. § 9001 et seq.  Under the statute, a person may petition a court authorized to exercise jurisdiction in the place where a child is located for the return of the child to his or her habitual residence in another

signatory country.   22 U.S.C. § 9003(b); **Pesin v. Rodriguez**, 244 F.3d 1250, 1251 n.2 (11th Cir. 2001).[2]

The removal or retention of a child is considered "wrongful" under the Hague Convention where: "(a) it is in breach of rights of custody attributed to a person ... either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b) at the time of the removal or retention those rights were actually exercised ...." Hague Convention, art. 3.

When a child is wrongfully removed, and if a petition is initiated less than one year after wrongful removal, the court must order the child's return, unless an enumerated exception applies.   See **Abbott v.**

_____

2. United States federal courts must comply with state law when ordering a child removed from the person with physical control of the child.   22 U.S.C. § 9004(b).   Because 1975 Ala. Code §§ 30-3B-302 and 30-3B-308(c) provide authority for courts to order the return of a child as outlined under the Hague Convention, the court adheres to Alabama law by complying with the Convention.

13

_Abbott_, 560 U.S. at 9 ("The Convention's central operating feature is the return remedy.  When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply.") (citing Hague Convention, art. 12).

### A. Wrongful Removal

As the Convention language makes clear, courts must make three determinations when deciding whether a child has been wrongfully removed: first, where the child was habitually a resident immediately before the purportedly wrongful removal; second, whether the petitioner had a right of custody under that country's law and the respondent violated that right of custody by removal; and, third, whether the right was being exercised at the time of the removal or would have been exercised but for the removal.  _See_ _Pastén v._

14

<u>Velásquez</u>, 462 F. Supp. 2d 1206, 1209 (M.D. Ala. 2006)
(Thompson, J.).   A petitioner must establish that a
child has been wrongfully removed by a preponderance of
the evidence.   22 U.S.C. § 9003(e)(1)(A).


### 1. Habitual Residence

'Custody rights' under the Convention are
determined by the law of the country in which the child
was habitually resident at the time of removal.   Courts
in the United States and foreign jurisdictions have
defined a child's habitual residence as "the place
where the child has been physically present for an
amount of time sufficient for acclimatization and which
has a degree of settled purpose from the child's
perspective."   <u>Pesin v. Osorio Rodriguez</u>, 77 F. Supp.
2d 1277, 1284 (S.D. Fla. 1999) (Lenard, J.) (citing
<u>Feder v. Evans-Feder</u>, 63 F.3d 217, 224 (3d. Cir.
1995)).   When a country has different territorial units
with different systems of law--for example, Mexico is

composed of 31 states and 1 federal district--the Convention provides that the law of the country of habitual residence "shall be construed as" the law of the territorial unit in the country where the child habitually resides.  Hague Convention, art. 31.

Here, there is no question that the children were habitual residents of the Mexican state of Chihuahua at the time of their removal.  They were both born in Chihuahua and, with the exception of the six-month period between 2011-2012 when Preston took the son to Alabama, both children have lived their entire lives there.  The court will therefore look to local Mexican law in the state of Chihuahua to determine whether Martinez's custody rights were breached by the removal. See Whallon v. Lynn, 230 F.3d 450 (1st Cir. 2000) (applying local Mexican law of state where children were habitually resident to the question of custody rights, pursuant to Mexican choice-of-law rules); Saldivar v. Rodela, 879 F. Supp. 2d 610, 622 (W.D. Tex.

16

2012) (Guaderrama, J.) (interpreting Mexican federalism and choice-of-law rules to apply the local law of the state of Chihuahua).

### 2. Rights of Custody and Violation of Rights of Custody

Under the Convention, a parent's "rights of custody" includes "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5(a); see also Furnes v. Reeves, 362 F.3d 702, 716 n.12 (11th Cir. 2004) (explaining that the Convention "favors a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration," because "the intention of the Convention is to protect all the ways in which custody of children can be exercised....") (emphasis in original) (internal citations omitted), abrogated on other grounds by Lozano v. Montoya Alvarez, 134 S. Ct. 1224 (2014).

Rights of custody may arise by operation of law, by a judicial or administrative decision, or by an agreement having legal effect under the law of the country of the child's habitual residence.  <u>See</u> Hague Convention, art. 3.   Here, Martinez argues that her rights of custody arise by operation of Chihuahua's civil-law doctrine of <u>patria potestas</u>, or parental authority and responsibility.[3]

The doctrine of <u>patria potestas</u> "has its roots in Roman law," where it "conveyed absolute and despotic rights of a father over his children"; today, in

_____

3. Courts in Hague Convention cases are often called upon to interpret foreign law, which can pose special challenges for them if they are unfamiliar with those rules.   In such cases and to assist in this court's determination, Federal Rule of Civil Procedure 44.1 liberalizes evidentiary rules and allows courts to "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."   Fed. R. Civ. P. 44.1.   The Convention, too, allows courts to "take notice directly" of the law and judicial and administrative decisions of the country of the child's habitual residence when determining whether a child was wrongfully removed.   Hague Convention, art. 14; <u>see also</u> <u>Salvidar</u>, 879 F. Supp. 2d at 621.

18

Mexico, the doctrine "'regulates relations between parents and children until the latter reach the age at which they must fend for themselves.'" Saldivar, 879 F. Supp. 2d at 623-24 (citing Patricia Begné, Parental Authority and Child Custody in Mexico, 39 Fam. L.Q. 527, 527-530 (2005)). It is "[d]esigned to protect the interest of children," and it "constitutes the 'most comprehensive' right that a parent can exercise over the person and property of his or her minor children." Id. (citing Stephen Zamora, et al., Mexican Law 482 (2004)); see also Begné, Parental Authority at 531 ("Custody and care of their minor children is the first duty of parents. Custody refers to being with and caring for the child. ... Parental authority places a series of correlative rights and obligations on the holder of parental authority, such as custody of the minors, the authority to raise them, discipline them, represent them in legal acts, administer their property, feed and care for them, etc.") (internal

19

citations omitted). In other words, _patria potestas_ establishes the parent's bundle of rights over a minor child, one of which is formal custody, but it also includes the right to care for the child and make decisions about his or her life.

Chihuahua's civil code reflects this view. Código Civil del Estado de Chihuahua [Chih. Civ. Code], tit. 8, ch. 1, art. 388 _et seq_. Under the civil code, _patria potestas_ rights are shared by father and mother, and they establish the right to care for, educate, spend time with, discipline, and set an example for the child. _See id_. at arts. 390; 391; 394; 399; 400. _Patria potestas_ also confers the right to live with the child and determine the child's location. _See id_. at art. 398 ("As long as the child is under parental authority/responsibility (_patria potestas_), he or she shall not leave the house of those who exert it without their permission or by means of an order emitted by an authority legally qualified to do so."). In short,

20

patria potestas includes "rights relating to the care of the person of the child," and the operation of the doctrine under the law of Chihuahua establishes that both Martinez and Preston shared "rights of custody" as contemplated by the Convention.  Hague Convention, art. 5; cf. Vale v. Avila, 538 F.3d 581, 586 (7th Cir. 2008) (holding that the Venezuelan doctrine of patria potestas conferred rights relating to the care of the person of the child under the meaning of the Hague Convention); Salvidar, 879 F. Supp. 2d at 623-626 (finding that the Mexican state of Chihuahua's doctrine of patria potestas establishes "rights of custody" under the Convention).

In the case of parental separation, the civil code provides that patria potestas rights and obligations continue, though parents mutually may alter these terms by agreement.  See Chih. Civ. Code, tit. 8, ch. 1, art. 393 ("In case of separation ..., both parents must continue fulfilling their obligations and they can

agree upon the terms of its exertion, particularly in all things concerning the care and custody of the minors."). If the parents are unable to reach an agreement, they may turn to a judge; absent a court ruling, however, their joint rights continue.

The separation provision, of course, is relevant to the crux of this case. Preston argues that, by signing the "Termination of Parental Rights Form," Martinez relinquished her rights of custody and any other custodial or access rights that might be recognized under the Convention. Similarly, Preston contends that, because Martinez signed the "Travel Consent Form," he did not breach her custody rights when he took the children to Alabama. Martinez responds that she was fraudulently induced to sign the forms; that she did not consent to relinquishing any parental or custodial rights; that her patria potestas and custody rights remained fully intact at the time of removal; and that Preston removed the children from her home in

breach of her rights, which were later recognized by the local family court.

This court agrees with Martinez that, by signing Preston's forms, she did not terminate her parental rights and that Preston's removal of the children to Alabama without her consent breached her rights of custody under the Convention.

As an initial matter, there was no true agreement between the parents to modify her rights. Preston fraudulently induced Martinez to sign forms in a language she did not adequately understand. There was significant dispute between the parties at the hearing regarding Martinez's English-language skills. Martinez testified that she cannot speak or read any English; Preston testified she could both speak and read English; and Preston's mother testified that she and Martinez had conversations in English about childcare and they also read children's books in English. On the record before it, the court need not resolve this

23

question.   Even  if  the  court  were  convinced  that
Martinez  could  speak  English,  it  would  be  only  very
limited  conversational  English,  and  the  court  would
still  conclude  that  her  spoken  and  written  English
skills  were  not  sophisticated  enough  to  read  or
understand  the  meaning  of  these  documents  on  her  own.

The  forms  purported  to  terminate  her  own  parental
rights,  allow  her  children  to  relocate  to  the  United
States,  and  prohibit  any  contact  with  her  until  the
children  reached  adulthood.   While  Preston  maintains
that  he  explained  to  Martinez  the  meaning  of  the  forms
and  the  terms  within  them  and  that  she  read,
understood,  and  consented  to  them,  the  court  does  not
find  his  testimony  credible.   Martinez's  actions  after
Preston  left  Mexico  reveal  his  lie.

First,  after  her  husband  left  with  her  children  on
April  29,  Martinez  displayed  both  <u>dispatch</u>  and
<u>persistence</u>  in  pursuing  the  location  and  return  of  her
children:  immediately  and  repeatedly  calling  to  find

out where her children were; filing a criminal complaint; initiating international proceedings in Mexico; and petitioning the family-court for custody. Her dispatch and persistence are inconsistent with her having knowingly and voluntarily agreed to the termination of her parental rights, just before her husband and her children left, and having knowingly and voluntarily turned over her children to her husband on the morning of their departure.

Second, Preston contends that he did not initiate proceedings in Mexico for the custody of his children because Mexico would not recognize him as a complainant; he further contends that he did not complain to Mexican officials that Martinez was unfit as a mother because he did not want the children taken into Mexican custody. However, if, as he contends, Martinez was so willing to terminate her parental rights and give him custody as reflected in the two documents he says she knowingly and voluntarily signed,

there is no reason why they both (or, more significantly, she alone at his request) could not have initiated Mexican proceedings to carry out this goal. The most plausible conclusion for why they did not do so is that Martinez was unwilling to cooperate in giving up her children.  The documents are fraudulent.

In other words, Martinez's signatures were induced by Preston's deception.  Because she did not consent, the court finds that there was no agreement to modify or terminate her parental rights.  <u>Cf</u>. Jorge A. Vargas, <u>Mexican Law for the American Lawyer</u> (2009), at 138, 141 (explaining that under Mexican law, an agreement that creates or transfers obligations and rights is a contract; that consent is an essential element to a contract; and that consent is "invalid if given by mistake, obtained by violence or duress or exacted by fraud") (internal citations omitted).  Martinez maintained her full <u>patria potestas</u> rights as the mother of her children, despite her signatures on these

**26**

forms, and there is no question that she possessed "rights of custody" as contemplated under the Convention at the time of her children's removal.

The court's conclusion is reinforced by other evidence. First, the civil code of Chihuahua is clear that patria potestas rights are "not waivable." Chih. Civ. Code, tit. 8, ch. 3, art. 425. As such, though a court may terminate, modify, or suspend a parent's patria potestas rights for various reasons, Martinez could not sign away these rights on the forms Preston produced for her even if she had wanted to. This interpretation of the law was confirmed by Jaime Valenzuela Escobar, one of Martinez's witnesses and a longtime practitioner in the family-court system of the state of Chihuahua, who explained that, under Mexican law, "no parent can renounce his or her universal parental rights. Only a court can withdraw them." Moreover, notarization--even when valid--does not make

valid a parent's attempt to surrender these rights without court involvement.

Second, Martinez initiated a custody proceeding against Preston in the Bravos District family court of Chihuahua shortly after Preston left with the children, and, on June 5, 2014, she received a default order granting her sole provisional guardianship over the two children.  As the family court explained, the children were ordered to be with their mother, "Due to social and legal interests and to the young age of the minors ... because they need special care that can only be provided by her."  Bravos Order (doc. no. 9), at 5.  If there is any remaining doubt as to the continuity of Martinez's parental rights under Mexican law, the family-court order makes clear that Martinez did not rescind her parental rights in any way by signing the fraudulent form.

Finally, Preston's removal of the children to Alabama without Martinez's consent or a judicial order

was in breach of her rights of custody, not to mention other correlative parental rights.  <u>See</u> Chih. Civ. Code, tit. 8, ch. 1, art. 398 ("The abduction or retention of the minor outside of his or her habitual residence without the permission of those exerting parental authority/responsibility (<u>patria potestas</u>) or custody, grants the right to initiate the restitution procedure contemplated in the Code of Civil Procedure."); <u>Saldivar</u>, 879 F. Supp. 2d at 626 (explaining that art. 398 of the Chihuahua civil code "gives a parent the right to consent before her child can be removed or retained away from Mexico"). Accordingly, Martinez has satisfied the second condition of wrongful removal.

### 3. Exercise of Rights of Custody

The third factual inquiry is whether the person seeking the child's return was actually exercising his or her rights of custody at the time of removal, or would have been but for the removal.

29

Up until the day the children were removed, Martinez shared with Preston joint custody of the children in their home. Martinez cared for her children, provided for their food and home, and arranged for their education and supervision at their daycare. This conduct makes clear that at the time of the removal, Martinez was actually exercising her rights of custody. See Hanley v. Roy, 485 F.3d 641, 650 n.8 (11th Cir. 2007) (concluding that grandparents were actually exercising custody when they lived with the children, provided for them, and paid for their school tuition, clothing, and household expenses); see also Sealed Appellant v. Sealed Appellee, 394 F.3d 338, 344-345 (5th Cir. 2004) (explaining that the "exercise" of rights of custody should be construed liberally and that "even occasional contact with the child constitutes 'exercise' of those rights").

Moreover, any argument that Martinez was not actually exercising her rights of custody by virtue of

signing the fraudulent forms fails. As discussed above, these forms had no legal effect on her status as a parent; they also had no practical effect, as even after signing the forms, she continued to live with and care for the children until they were removed from her custody several weeks later.

Therefore, Preston wrongfully removed the two children within the meaning of the Hague Convention.

## B. Affirmative Defenses

Under certain exceptional circumstances, a court may refuse to return a child to his or her country of habitual residence for a custody determination, even when it finds that the child was wrongfully removed. These exceptions should be construed "narrowly," and, given the aims of the Convention, a court maintains the discretion to return the child despite the existence of a defense. Baran, 526 F.3d at 1345.

Three of these defenses are relevant here.  First, if the proceeding was commenced a year or more after the child's removal and if the respondent establishes that the child is now settled in the new environment, the court may refuse to return the child.  See Hague Convention, art. 12.  Second, the court may refuse to return the child if there is a "grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Id. at art. 13(b).  Finally, the court may refuse to return the child if the respondent establishes that the left-behind parent consented to or subsequently acquiesced in the removal. See id. at art. 13(a).

The affirmative defense of physical or psychological harm or other intolerable situation must be established by clear and convincing evidence; the other exceptions argued in this case must meet the preponderance-of-the-evidence standard.  See 22 U.S.C.

32

§ 9003(e)(2)(A) & (e)(2)(B).   The court will examine each defense in turn.


### 1. Settlement Defense

The Convention provides that, where "a period of less than one year has elapsed from the date of the wrongful removal" to the commencement of proceedings, the court "shall order the return of the child forthwith."   Hague Convention, art. 12 (emphasis added).   On the other hand, if one year or more has passed, the "shall" language does not apply if the respondent can show that the child is now "settled" in his or her new environment, id., a defense that allows the court to consider stability in the child's family, educational, social, and home life.   See Lozano v. Montoya Alvarez, 134 S. Ct. 1224, 1231, 1234-35 (2014) (explaining that "the expiration of the 1-year period opens the door to consideration of ... the child's interest in settlement"); see also Hague International

33

Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. 10494, 10507 (Mar. 26, 1986) (explaining that the settlement defense is available for petitions filed "a year or more" after removal).

Therefore, the first question for this defense is whether one year or more has passed.  Preston argues that Martinez filed her petition exactly one year after she learned that her children had been removed and that, as such, he is entitled to present evidence that the children are now settled in Alabama.

The court finds Preston's computation unpersuasive. The children were removed on April 29, 2014, and Martinez filed her petition on April 28, 2015.  The Hague Convention itself is silent on computational methodology, but Rule 6 of the Federal Rules of Civil Procedure, which governs the procedures in this court, establishes a default method for computing time when a particular method is not specified in a statute: the day of the event that triggers the period should be

excluded from the computation, but the last day of the period should be included (unless it is a weekend or court holiday).  Fed. R. Civ. P. 6(a)(1).  Using this method, Martinez filed her petition 364 days after the children were wrongfully removed--less than one year.

Preston contends that the court should include the day of removal in its computation, resting his argument on a case explaining that "the one-year limit runs when the petitioner should have known" of the wrongful removal.  Muhlenkamp v. Blizzard, 521 F. Supp. 2d 1140, 1151 (E.D. Wash. 2007) (Shea, J.).[4]  But the court in that case merely was determining which day triggers the one-year period; it did not find that the trigger day should be included in the one-year computation or

---

4.  It is worth noting here that the proposition that the one-year period can be equitably tolled when the abducting parent conceals the location of the child from the left-behind parent--formerly the rule in the Eleventh Circuit--was recently overruled by the Supreme Court.  See Lozano v. Montoya Alvarez, 134 S. Ct. 1224 (2014) (abrogating Furnes v. Reeves, 362 F.3d 702 (11th Cir. 2004)).

establish any other unique computation method.  Beyond this citation, Preston has provided the court no persuasive reason why the methodology set forth in Rule 6 should not apply.  Nor does he argue that Rule 6 conflicts with the language or purposes of the Hague Convention.  As such, the court adopts the Rule 6 method for this case.  See Falk v. Sinclair, 692 F. Supp. 2d 147, 164 (D. Me. 2010) (Singal, J.) (applying Fed. R. Civ. P. 6(a)(1) to compute the one-year period in a Hague Convention case).

Therefore, because less than one year had elapsed before Martinez initiated these proceedings, the court will not--and, indeed, cannot--consider evidence that the children are now settled in their new environment.

### 2. Physical or Psychological Harm

Preston next argues that returning the children will expose them to a grave risk of physical or psychological harm or place them in an otherwise

intolerable situation.  Preston contends that Martinez is addicted to drugs and alcohol and that she leaves the children at home unsupervised or supervised only by an older sibling for hours, days, or sometimes longer. Preston also hinted at generalized safety and crime concerns in Ciudad Juárez, though he did not identify any particular risks to his children, beyond his belief that they are more vulnerable to kidnapping as Americans.

The exception for grave harm "is not license for a court in the abducted-to country to speculate on where the child would be happiest," as that question is a custody matter.  Friedrich v. Friedrich, 78 F.3d 1060, 1068 (6th Cir. 1996).  Nor is the court to consider whether the child would be returning to a home where finances or educational resources are more limited, id. at 1068-69, or "who would be the better parent in the long run."  Whallon, 230 F.3d at 459.  Rather, this exception contemplates a situation where the

37

possibility of harm is "a great deal more than minimal," id., such as if returning the child puts him or her "in imminent danger prior to the resolution of the custody dispute--e.g., returning the child to a zone of war, famine or disease," Friedrich, 78 F.3d at 1069 (emphasis in original), or in cases of serious abuse or neglect, such as when a custodial parent sexually abuses the child and "the other parent removes or retains the child to safeguard it against further victimization." Baran, 526 F.3d at 1348 (citing Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. at 10510); cf. id. at 1352 (holding that credible evidence of father's violence in his son's presence; threats to his son's safety; and inability to properly care for himself or son due to injury and alcohol abuse demonstrated a grave risk of harm).

Preston has failed to establish by clear and convincing evidence any such extraordinary circumstance

in Juárez or within Martinez's family. Preston testified, as stated, that Martinez had a drug and alcohol problem and that she would frequently leave the children at home alone, sometimes for days at a time. Specifically, Preston noted one incident where he came home after a trucking job to find the children alone and their son's arm broken. Preston also contended that Martinez's substance-abuse problems and negligent care of the children caused him to lose several trucking jobs, as he would be forced to stay off the road and home with the children when she was missing.

But Preston's fraud on both Martinez and the court with the two documents calls into question his overall credibility, and thus the court is unwilling to rely on his testimony in determining whether Martinez has, as he contends, a substance-abuse problem and is negligent in her care of the children. Moreover, there is nothing in the record to indicate that Mexican courts cannot address and act with sufficient rapidity to

39

protect the children's interests and any problem that does exist. Indeed, if Preston has concerns, he can move swiftly for immediate relief by responding to the provisional custody proceedings that have already been initiated in the Bravos District family court. This court leaves it up to the Mexican courts to determine whether Preston's criticisms of his wife are merely the false aspersions of an angry, estranged husband seeking to gain custody of his children by any means, legal or illegal, or whether Martinez, in fact, has such problems. This court should not be understood in any way to have found that she does or does not have such problems.

### 3. Consent or Subsequent Acquiescence

Finally, Preston argues that Martinez consented to or acquiesced in the children's removal. For the myriad reasons discussed above, Martinez did not consent to the removal of her children, and her conduct

immediately after Preston left for Alabama makes clear that she did not acquiesce to their removal once they were gone.  See Friedrich, 78 F.3d at 1070, 1070 n.13 (holding that the exception for acquiescence must be "convincing," and explaining that a "hastily-drafted and soon-rued written agreement" would be insufficient under this standard).

***

In conclusion, because Martinez's children were wrongfully removed under the Hague Convention, the court will grant her the relief she requests.  The court will order that the children be returned to Mexico for a custody determination to be made by a Mexican court under Mexican law.  Martinez's legal fees and the cost of the children's return transportation are to be borne by Preston, pursuant to 22 U.S.C. § 9007(b)(3).

41

Nevertheless, there remains the important logistical question of how the children are to be expeditiously and safely returned to Mexico. Before making this decision, the court will again consult with counsel for both Martinez and Preston. The court will also consider taking advantage of an offer of assistance from the Office of Children's Issues of the United States Department of State, which "performs the functions of the Central Authority for the United States under the Convention." Letter from the United States Department of State, Office of Children's Issues (doc. no. 13-1). The Office has the legal authority to offer the consultation services of four "U.S. Network Judges," who are "experts in the Convention and other international family law issues." Id.

An appropriate judgment will be entered.

DONE, this the 20th day of May, 2015.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE